UNITED STATES of America, Plaintiff,

v.

The GILLETTE COMPANY, et al., Defendants.

Civ. A. No. 93–0573 (RCL).

United States District Court, District of Columbia.

May 5, 1993.

Burney P.C. Huber, Dept. of Justice, Antitrust Div., Washington DC, for plaintiff.

Robert B. Greenbaum, Skadden, Arps, Slate, Meagher & Flom, Washington, DC, and Neal R. Stoll, Bruce J. Prager, and Alec Y. Chang, Skadden, Arps, Slate, Meagher & Flom, New York City, for Gillette.

David A. Clanton and John W. Polk, Baker & McKenzie, Washington, DC, for Parker.

*MEMORANDUM OPINION*

LAMBERTH, District Judge.

This case comes before the court on plaintiff's motion for a preliminary injunction. Upon consideration of the representations of counsel, and for the reasons stated below, plaintiff's motion is denied.

## I. *BACKGROUND.*

Pursuant to an Offer Arrangements Agreement dated September 10, 1992, The

Gillette Company ("Gillette") posted a tender offer on March 23, 1993, to purchase all outstanding stock and options of the co-defendant in this action, Parker Pen Holdings, Ltd. ("Parker"). Between the date of the agreement and the posting of the offer, the two defendants were in communication with the Antitrust Division of the Department of Justice ("plaintiff") concerning a potential violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

Plaintiff's interest in this acquisition is focused on the premium fountain pen [1] market in the United States. Based on 1991 sales,[2] Gillette (through its Waterman brand) controls approximately twenty-one percent of the U.S. premium fountain pen market; Parker has a nineteen percent share.[3] Plaintiff's concern is that the effect of the combination of Gillette and Parker "may be substantially to lessen competition" in the premium fountain pen market. *See* 15 U.S.C. § 18.

Unable to reach an agreement with the defendants, plaintiff brought this suit on March 22, 1993, seeking a declaration that the proposed acquisition is in violation of Section 7; as well as a temporary restraining order, a preliminary injunction, and a permanent injunction barring any combination of the two defendants. Immediately thereafter, in an attempt to forestall Gillette's March 23, 1993, tender offer, plaintiff moved for a temporary restraining order. The motion was heard by Judge Sporkin, sitting as the motions judge. Judge Sporkin denied the motion, largely on Gillette's representation that it would not acquire any shares of Parker until May 6, 1993.

This court granted the parties' motions for expedited discovery and a shortened briefing schedule in order to resolve this case before May 6, 1993, when Gillette's Offer Arrangements Agreement with Parker terminates.

Thus, after hearing oral argument on plaintiff's motion for a preliminary injunction on May 4, 1993, the case is ready for decision.[4]

## II. DISCUSSION.

### A. Preliminary Injunction Standards.

■ This case is before the court on plaintiff's motion for a preliminary injunction. Often in Clayton Act cases, the suit is brought by the Federal Trade Commission (FTC) pursuant to 15 U.S.C. § 53(b). In those cases, the standard for a preliminary injunction is the statutory "public interest" test: whether "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b). *See, e.g., FTC v. Owens–Illinois, Inc.,* 681 F.Supp. 27, 33 (D.D.C.), *vacated as moot,* 850 F.2d 694 (D.C.Cir.1988).

This case, however, is not brought pursuant to § 53(b) and therefore the court must apply this circuit's fundamental four-part preliminary injunction standard. That test requires that the court balance:

(1) the likelihood of the plaintiff's success on the merits;

(2) the threat of irreparable injury to the plaintiff in the absence of an injunction;

(3) the possibility of substantial harm to other interested parties from a grant of injunctive relief; and

(4) the interests of the public.

*See, e.g., Foundation on Economic Trends v. Heckler,* 756 F.2d 143, 151–52 (D.C.Cir.1985).

### B. Likelihood of Success.

■ Before a preliminary injunction may be issued, plaintiff must establish that it has demonstrated a likelihood of success on the merits. In a Section 7 case, plaintiff effectively must meet two criteria: (1) it

---

**1.** "Premium fountain pens," according to plaintiff's definition, are refillable fountain pens with suggested retail prices ("SRPs") of between $50 and $400.

**2.** Retail sales of premium fountain pens in 1991 were approximately $46 million.

**3.** The third major firm in the market is the current top seller, Richemont, the maker of Mont-

blanc pens; Richemont possesses just less than forty percent of the premium fountain pen trade.

**4.** Defendant has contested neither plaintiff's standing to bring this action nor venue in this court. In any event, the suit is properly brought under 15 U.S.C. § 25; venue in this court is premised on 15 U.S.C. § 22 and 28 U.S.C. § 1391.

must demonstrate that a proposed combination will affect a "line of commerce," (the determination of which includes the demonstration of a relevant product market and a relevant geographic market); and (2) it must demonstrate that the combination "may be substantially to lessen competition." 15 U.S.C. § 18.

### 1. Line of Commerce.

■ The first step in any Section 7 case is to determine the relevant product market. *United States v. E.I. duPont de Nemours & Co.*, 353 U.S. 586, 593, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057 (1957). To this end, plaintiff alleges that the relevant "line of commerce" is premium fountain pens, which it defines as "high quality refillable fountain pens that have an established premium image among consumers." Complaint ¶ 3. (A more practical definition, given plaintiff's evidence and arguments, is "refillable fountain pens with a SRP of between $50 and $400.") The relevant geographic market, plaintiff asserts, is the United States.

Defendants object to both aspects of this definition. First, defendants asserts that a market for fountain pens may not be segregated out from what is a continuum of prices; in other words, the government cannot exclude pens with SRPs of less than $50 or more than $400 in its definition of the relevant product market. Second, defendants claim that the definition should be expanded to include other highline writing instruments.[5] Third, defendants contend that plaintiff's market statistics are incomplete, inconclusive, and unreliable. Finally, addressing the geographic market, defendants assert that the relevant geographic market is Planet Earth.

### a. Determining a Price Range.

Defendants' first argument is that a relevant product market cannot be defined by reference to a narrow price range along a broader continuum of prices. In support of this argument, defendants cite several cases in which courts held that so-called "premium" products fell into the same market as so-called "non-premium" products.[6] These cases, defendants contend, preclude plaintiff's segregation of a narrowly drawn $50 to $400 market.

■ However, the court finds that plaintiff has met its burden and demonstrates that a separate market for fountain pens in the $50 to $400 range exists. The determination of what constitutes the relevant product market hinges on a determination of those products to which consumers will turn given reasonable variations in price. Therefore, the definition must exclude those items to which "only a limited number of buyers will turn; in technical terms, products whose 'cross-elasticities of demand' are small." *Times–Picayune Pub. Co. v. United States*, 345 U.S. 594, 612 n. 31, 73 S.Ct. 872, 882 n. 31, 97 L.Ed. 1277 (1953).

■ Because the court may include in its definition of the relevant product market only products which meet this standard, the cases defendants cite are inapposite. The court acknowledges that in *Brown Shoe* (the major case cited by defendants), the Supreme Court upheld the district court's fact-based determination that medium-priced shoes competed with low-priced shoes. A blind application of this precedent to the present case, therefore, would seem to prohibit plaintiff's market definition.[7] However, while the *Brown* Court dictated that "the boundaries of the relevant market must be drawn with sufficient breadth to include the

**5.** Defendants' definition of the relevant product market would be "all writing instruments with a SRP in excess of $10."

**6.** Defendant cites the following cases for this preclusion: *Brown Shoe Co. v. United States*, 370 U.S. 294, 326, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962); *Liggett & Myers, Inc. v. FTC*, 567 F.2d 1273, 1274–75 (4th Cir.1977); *In re Super Premium Ice Cream Distribution Antitrust Litig.*, 691 F.Supp. 1262, 1268 (N.D.Cal.1988), *aff'd,*

895 F.2d 1417 (9th Cir.1990); *United States v. Jos. Schlitz Brewing Co.*, 253 F.Supp. 129, 134 (N.D.Cal.), *aff'd*, 385 U.S. 37, 87 S.Ct. 240, 17 L.Ed.2d 35 (1966); *Coca–Cola Bottling Co. of New York*, 93 F.T.C. 109, 190–91 (1979).

**7.** Needless to say, in a fact-intensive determination such as one under the Clayton Act, the blind application of any precedent, as defendants seem to desire, is inappropriate.

competing products of each of the merging companies and to recognize competition where, in fact, competition exists," 370 U.S. at 326, 82 S.Ct. at 1524, implicit in this statement is the mandate that the market similarly must be limited to recognize *only* those products which in fact do compete with the products of the merging companies. Thus, the Court specifically held that sub-markets *were appropriate* in certain circumstances, and then set forth several criteria for courts to consider in determining whether a sub-market exists. 370 U.S. at 325, 82 S.Ct. at 1525. Those criteria include some factual circumstances not present here (such as unique production facilities), some partially present (specialized vendors), and some that clearly demonstrate that $50–$400 premium fountain pens are a sub-market of the fountain pen industry (industry or public recognition of the sub-market as a separate economic entity, distinct customers, and sensitivity to price changes).

█ The court finds that plaintiff has provided ample evidence that fountain pens in the $50 to $400 range effectively do not compete with fountain pens either below or above that range. Plaintiff therefore has met its Clayton Act burden. In contrast to fountain pens with SRPs below $50, the fountain pens here at issue afford their users (as well as those who merely put them in their breast pockets) image, prestige, and status. In accordance with this prestige, manufacturers, retailers, and purchasers of the pens recognize that there is a distinction between these pens, which several of plaintiff's affidavits suggest are priced at approximately $50 and up, and those pens which are priced below this threshold. The evidence suggests that, should the price of a fountain pen costing, for example, $60 be increased in a non-trivial, non-transitory fashion, consumers will nonetheless purchase the now-costlier pen rather than substitute a less expensive, less prestigious model. In other words, there is a low cross-elasticity of demand between these pens and those priced below $50.

Similarly, fountain pens priced above $400 also are not interchangeable with pens costing less than $400. Again, there is a threshold beyond which the pens become mere collectors items or "jewelry" pieces, and the evidence suggests that consumers will not substitute the $400-and-up pens if prices were to be raised on premium fountain pens.

Therefore, this case is distinguishable from *Brown Shoe* and the other cases cited by defendants. Although—as in those cases—there indeed is a continuum of fountain pen prices (from less than $10 to more than $10,000), plaintiff has nonetheless demonstrated that—unlike those cases—the fountain pen market may be divided into three sub-markets: for lack of better terms, "base" fountain pens (less than $50); "premium" fountain pens ($50 to $400); and "jewelry" fountain pens ($400 and up). In support of the court's position are cases such as *Reynolds Metals Co. v. FTC*, 309 F.2d 223, 229 (D.C.Cir.1962), which distinguished between the markets for florist foil and for lower-priced decorative foil because there the two types of florist were not used interchangeably.

However, in none of defendants' cases is such a distinction possible. For instance, in *Liggett & Myers*, the court faced evidence that pet owners, when faced with relative price changes, would switch between premium and economy dog foods; the two categories thus competed with each other. Similarly, in *Jos. Schlitz*, the court found that "the competition for beer consumers' dollars is reflected in competition among *all* beers," 253 F.Supp. at 146, and that "[a]ll brands and types of beer compete with each other in price, image,...." 253 F.Supp. at 134. And, evidence was present in *Coca–Cola* that sweeter dessert wines did not constitute a separate market because they were in competition with, as well as complementary to, more standard table wines. Finally, in *Super Premium Ice Cream*, there was insufficient evidence to demonstrate that buyers do not switch from super premium ice creams to lower priced ice creams or other desserts. Thus, contrary to the present situation, the evidence in each of these five cases either (1) established that products along the continuum competed with each other; or (2) failed to establish that there were distinct sub-

markets.[8]

Defendants—inevitably—claim that, even if the court finds that there might be a distinct sub-market, other factors make the $50 to $400 market definition insupportable. Each of these objections, however, lacks merit. For instance, the claim that some sellers discount their wares to their customers does not preclude a definition based on suggested retail price. A second objection, that the market may start at $40 or $70 rather than $50 (and comparable imprecision at the upper end of the range) is similarly unhelpful to defendants. First, there is sufficient evidence to support each end point. In addition, defendants have failed to demonstrate that a minor modification up or down would have any effect on the market share statistics proffered by plaintiff. Based on the exhibits appended to the affidavit of defendants' expert witness, the court determines that these modifications would not have any material effect.

Therefore, the court finds that plaintiff has met its burden of demonstrating that a sub-market with a price range of $50 to $400 may be segregated out of the larger fountain pen market for Clayton Act purposes.

### b. Determining Included Modes.

■ Defendants' second objection to plaintiff's proposed definition is that other writing modes—ballpoint pens, rollerball pens, and pencils—should also be included. In effect, defendants assert that the relevant product market should be all "highline" writing instruments (with a "highline" instrument being defined as one with an SRP of more than $10).

Plaintiff demonstrates that there is a subset of fountain pen consumers who are dedicated to premium fountain pens; these customers will not substitute another mode of writing (be it ballpoint pens, rollerball pens, or mechanical pencils) when faced with a non-trivial, non-transitory increase in price. For this group (and this group only), therefore, the relevant market definition would be the one proffered by plaintiff: refillable fountain pens with SRPs of $50 to $400. Plaintiff has demonstrated that this is a highly-concentrated market (both before and after Gillette acquires Parker); and, if this were the end of the discussion, plaintiff's assertions regarding anti-competitive effects (for instance, unilateral effects such as higher prices, reduced innovations, and fewer products) likely would prevail.

However, this is not the end of the discussion since this limited subset of fountain pen devotees does not encompass the entire universe of consumers; rather, a larger market must be defined. The record indicates that there is a much larger subset of fountain pen consumers who *will* substitute other modes of writing for fountain pens; for these customers, fountain pens therefore are in direct competition with these other modes. *See Owens–Illinois* (since captive end users of all-glass containers constituted only 25% of all consumers, relevant product market was defined as "rigid-walled containers," not "all-glass containers"). This market is defined as all premium writing instruments (which the court will, for purposes of this discussion, define as mechanical pencils and refillable ballpoint, rollerball, and fountain pens with SRPs from $40 [9]—$400). Plaintiff has not alleged that this market is highly concentrated either before or after the merger and has not demonstrated that the merger will have anti-competitive effects on this market.

### c. Conclusion.

The court therefore holds that the product market proposed by plaintiff is far too narrow. As discussed above, the court finds that the appropriate product market is significantly broader: all premium writing instru-

---

8. It is interesting that in most of the cases cited by defendants, *defendants* attempted to subdivide the market into smaller, price-divided sub-markets; and, in each case, the court rejected that attempt. Here, it is the defendant who is trying to avoid such a sub-market definition. The court takes no position on whether this distinction is relevant.

9. Forty dollars, rather than fifty, is the appropriate lower boundary on the price range as several of the fountain pen models which retail in the $50–$55 range are members of product families in which the ballpoint pen retails for approximately $40. Thus, the same prestige, image, and quality obtainable in a $50 fountain pen are available for approximately $40 in other modes of writing instruments.

ments. As to this market, plaintiff has failed to meet its prima facie case. Although plaintiff is correct in segregating out a "premium" sub-market from the larger fountain pen market, it has failed to demonstrate that premium fountain pens are not in competition with other premium writing instruments. Plaintiff has not made its prima facie case, therefore, and the court finds that plaintiff is not likely to succeed on the merits of the case as to this point should the case proceed to a full trial.[10]

### 2. *"Substantially to Lessen Competition."*

 In an abundance of caution, the court will also examine the second portion of plaintiff's prima facie case under Section 7: that the proposed merger is likely substantially to lessen competition. The court looks at both markets—the sub-market plaintiff wished the court to define as well as the market actually defined by the court—and finds that plaintiff has not met its burden as to this requirement, either.

In the second market, that of all premium writing instruments, plaintiff has not alleged that the Gillette/Parker merger will have anti-competitive effects. Nor has plaintiff demonstrated that the market is highly concentrated either before or after the merger. Rather, the evidence indicates that the market is awash with manufacturers and that the merger is unlikely to give the merged company the ability—unilaterally or collusively—to create anti-competitive effects. Therefore, plaintiff fails to make its prima facie case as to the relevant product market actually defined by the court.

Even if the court had adopted the proposed market definition proffered by plaintiff, however, the court still would have found that plaintiff had failed to meet its burden. In that market, plaintiff does demonstrate that there is a highly-concentrated market which will become even more concentrated should the proposed merger take place. The court will therefore assume that plaintiff enjoys the presumption that the merger will

create anti-competitive results. *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363, 83 S.Ct. 1715, 1741–42, 10 L.Ed.2d 915 (1963). Defendants, however, may—and in this case, do—rebut that presumption. *Ibid. See also United States v. Baker Hughes, Inc.*, 908 F.2d 981 (D.C.Cir.1990).

The court finds that the evidence in this case, particularly the evidence derived from the larger market, clearly shows that the anti-competitive effects plaintiff fears are not likely to occur, even in plaintiff's sub-market. Plaintiff does not counter successfully defendants' evidence.

Several factors lead the court to this conclusion. *First*, there is ample evidence that the merged company will not be able to increase prices on premium fountain pens unilaterally:

● There is ample evidence that fountain pens compete with other modes of writing. Given the overlap of prices (several fountain pens are priced less than ballpoint pens and rollerball pens), an increase in one type of pen will make it relatively less attractive than other types of pen.

● In addition, many of the manufacturers create "families" of pens; each family may include a fountain pen, a rollerball pen, a mechanical pencil, and a ballpoint pen. If, as the government contends, much of the cachet of these premium instruments is their "image," at least some customers are going to view the fountain pen and the other modes within a family as in competition with each other. Therefore, if Gillette were to increase prices on its fountain pens, it would likely lose customers to its other pens in the same family (if not to other manufacturers).

● And, there is ample evidence that the mechanics of fountain pen design are readily available, thus leaving no technological barriers to entry into the market. There are also no legal or regulatory barriers which would preclude competitors from designing and selling premium fountain pens. *Compare Hospital Corp. of America v. FTC*, 807 F.2d

---

**10.** Because the court in the next section determines that plaintiff has failed to demonstrate its likelihood of success on the merits, the court need not—and does not—address the third as-

pect of the definition of a relevant product market, the determination of the relevant geographic market.

1381 (7th Cir.1986), *cert. den'd,* 481 U.S. 1038, 107 S.Ct. 1975, 95 L.Ed.2d 815 (1987). Although it may take a significant investment of time and money to build market share, the record demonstrates that there are new entrants into the fountain pen market which are able to check increases in price.[11] In addition, given the competition between fountain pens and other modes of writing and the ease with which manufacturers may enter this wider market, Gillette will not be able to raise prices unilaterally on its premium fountain pens.

*Second,* there is ample evidence to indicate that the merger will not create a decrease in available or new products and innovations:

● The evidence demonstrates that innovation (particularly in design) is crucial to maintaining market share; therefore, if Gillette desires to remain competitive in the fountain pen market, it must compete with other companies' innovations in fountain pens and in other modes of writing.

● Again, other companies are free to enter the market as well (and there is much evidence that companies large and small have introduced a multitude of new products over the past few years; there is also evidence that many companies plan on introducing new models in the next few years).

*Third,* there is no evidence that there will be any collusion in this market between Gillette and Richemont (Montblanc), the current top seller of premium fountain pens.

▬ Plaintiff need not show that there is a certainty that the merger will create anticompetitive effects; it must merely show that it is probable. *Hospital Corp. of America,* 807 F.2d at 1389 (citing *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 362, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1963)). However, defendants' evidence (as well as much of the record provided by plaintiff) demonstrates that there is great competition between premium fountain pens and other modes of writing. Therefore, even though some customers would be captive to price increases in the premium fountain pen industry, the significant competition in the premium writing instrument market renders premium fountain pen price increases unprofitable.

In sum, the court finds that the merger of Gillette and Parker is not likely substantially to lessen competition and that plaintiff has not demonstrated that it is likely to prevail on the merits should this case proceed to trial.

#### C. *Irreparable Injury.*

Plaintiff has represented that, should the court fail to enter a preliminary injunction, the court probably will be left powerless to fashion relief even if it were to find a Clayton Act violation after a full trial. Plaintiff alleges that under the United Kingdom's Protection of Trading Interests Act 1980, the government of the United Kingdom could preclude any divestiture of Parker by Gillette.

The court takes plaintiff's representations at full value and assumes that denying plaintiff's motion would effectively render this transaction final and irreversible. Therefore, plaintiff meets its burden on this point.

#### D. *Substantial Harm to Other Interested Parties.*

Parker and Gillette have also claimed that a decision adverse to them will create irreparable injury. Both parties have asserted that Gillette's agreement to acquire Parker must be consummated by May 6, 1993; otherwise, the agreement is void. Moreover, Parker has represented that its board has decided that it will not negotiate further with Gillette should this agreement fall through.

These statements, of course, cannot be given full value. Because the decision whether to negotiate further is solely within the control of the defendants, any claimed injury is also within the control of the defendants as well. In other words, the irreparable injury defendants claim can only exist if the defendants allow it to exist.

---

11. Plaintiff has focused heavily on "fringe" manufacturers, those who account for less than three percent of the market, but largely has ignored makers such as Cross and Sheaffer, both of which already enjoy a large market share and strong reputations. Expansion by these makers also is a check on Gillette's ability to raise prices.

Nonetheless, the court cannot ignore that a transaction valued at in excess of $400 million would be forestalled because each party sells approximately $5 million (at wholesale) in premium fountain pens. Given the magnitude of the transaction, the size of the companies, and the potential overall benefits to the public from this transaction, defendants have a valid claim that they will be injured by the entry of a preliminary injunction, the effect of which may well be to preclude the merger.

### E. *The Interests of the Public.*

■ The interests of the public are not necessarily coextensive with the irreparable injury criterion discussed in Part D., above, even though the case is brought by the United States to enforce federal anti-trust laws. However, for purposes of this decision, given that any merger likely will not be reversible, the court will assume that the interests of the public weigh in favor of an injunction.

### F. *Conclusion.*

Given the potential permanent and unalterable nature of this merger, the court has given plaintiff's evidence the most sympathetic reading possible and has resolved all ambiguities and conflicts in favor of plaintiff. In balancing the four factors for a preliminary injunction, the court has given plaintiff full credit for irreparable injury (the second criterion) and the interests of the public (the fourth criterion) and has afforded defendants no weight on the injury to other parties standard (the third criterion). The court also recognizes that, given the strength of plaintiff's irreparable injury argument, plaintiff need only make a lesser showing on likelihood of success.

However, plaintiff has failed absolutely to meet its burden on both aspects of its prima facie case—the definition of a relevant product market and a demonstration of a likelihood of substantially reduced competition.

Therefore, plaintiff has failed to meet even the lesser standard on the first criterion, likelihood of success; the criterion weighs completely in favor of defendants. As plaintiff has failed to demonstrate any likelihood of success, the court may not enter a preliminary injunction on this balance.

### III. *CONCLUSION.*

While some users are devoted to fountain pens to such a degree that they are captive to non-trivial, non-transitory price increases, a broader market enjoys active competition among all modes of premium writing instruments. This market is the relevant product market to be addressed in this case. The competition in this market serves to prevent any anti-competitive effects from arising— both in plaintiff's narrow market and in the premium writing instruments market as a whole—after this transaction is consummated. As such, plaintiff has failed to demonstrate that it is likely to succeed on the merits should this case go to trial. A balancing of the four preliminary injunction criteria, even when the latter three are viewed in the light most favorable to plaintiff, indicates that the court may not enter a preliminary injunction on this record.[12]

Plaintiff's motion for a preliminary injunction therefore is denied.

---

12. Despite the limited time involved, both parties have provided the court with a remarkably complete and detailed record; in fact, the record is more complete than many cases are after trial. Thus, the court feels confident in reaching its conclusion that plaintiff is not likely to succeed on the merits after a full trial, should a full trial ever occur in this case. The reality of the situation is that, even though some customers are beholden to fountain pens, the average consumer is not; thus, the fountain pens must compete with other modes of writing and the fountain pen market is affected by and constrained by developments in that larger market.