# United States Court of Appeals
## For the First Circuit

No. 11-1663

FISHMAN TRANSDUCERS, INC.,

Plaintiff, Appellant,

v.

STEPHEN PAUL, d/b/a Esteban; DAYSTAR PRODUCTIONS;
HSN INTERACTIVE LLC,

Defendants/Third-Party Plaintiffs-Appellees.

FORCE USA, INC.; FORCE, LTD.,

Third-Party Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before
Boudin, Circuit Judge,
Souter,[*] Associate Justice,
and Thompson, Circuit Judge.

Sibley P. Reppert with whom Michael J. Markoff and Pearl Cohen
Zedek Latzer, LLP were on brief for appellant.
Edward T. Colbert with whom T. Cy Walker, Susan A. Smith,
William M. Merone, Erik C. Kane, Kenyon & Kenyon LLP, Michael B.
Keating and Foley Hoag LLP were on brief for appellees.

July 3, 2012

[*]The Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**BOUDIN, <u>Circuit Judge</u>.** This appeal concerns claims by Fishman Transducers, Inc. ("Fishman"), primarily for trademark infringement and false advertising under the Lanham Act, 15 U.S.C. § 1051 <u>et seq.</u> (2006), against HSN Interactive LLC ("HSN"), musician Stephen Paul and his company Daystar Productions. Fishman failed to get the relief it sought in the district court and now appeals. We refer to the Lanham Act throughout by its Title 15 section numbers rather than the sections in the original statute.

Fishman is a developer and manufacturer of electronic equipment, specifically a highly-regarded line of acoustic equipment that can be attached to individual musical instruments to provide sound amplification. Fishman guitar "pickups" often include both a transducer and a preamplifier or equalizer, although the term can also refer to only the transducer. The Fishman transducer is a small device usually installed inside the guitar where it is not immediately visible.

HSN is a retailer of various consumer goods and sells products on its website; its sister company sells products on the television channel Home Shopping Network; for purposes of this case the two entities were treated as one. In late 2006, HSN sold through the website and television station about 70,000 "Esteban" guitars that it identified in the programming and website-- inaccurately, it now concedes--as containing Fishman pickups. This

trademark violation is the centerpiece of the litigation that led to this appeal.

Esteban is the performance name used by musician Stephen Paul who, with his company Daystar Productions, has collaborated with HSN since 2001 to market and sell Esteban guitar packages (usually a guitar equipped with a pickup as well as accessories such as a strap, case, amplifier and instructional videos). Beginning in October 2006 on the HSN channel, Paul lauded Fishman pickups, emphasized that the guitars included them and boasted that a Fishman pickup alone would sell for as much as the full HSN package. Beginning in the second quarter of 2006, the HSN website simply listed a Fishman pickup as a specification of the guitars.

Several months after the television advertising began, Fishman contacted HSN and Daystar and demanded an end to claims in the broadcasts and on the website that the guitars contained Fishman pickups. HSN complied and ceased to make reference to Fishman pickups in its sales pitches and on its website. Fishman also brought suit in the district court, stating claims against HSN, Paul and Daystar under the Lanham Act for trademark violation and false advertising, the Massachusetts Consumer Protection Act, Mass. Gen. L. ch. 93A, and state common law trademark infringement and unfair competition.

After extensive discovery and shortly before trial, the district court dismissed Fishman's chapter 93A claim, denied its

request to present evidence of "trademark counterfeiting," 15 U.S.C. § 1114, and ruled that the parties were not in "direct competition" (the latter relevant to damages under the Lanham Act). Fishman Transducers, Inc. v. Paul, No. 07-cv-10071 (D. Mass. Mar. 7, 2011). During the trial, the district court ruled inadmissible key damage evidence proffered by Fishman, but left open evidence of disgorgement of profits for a separate hearing before the judge, 15 U.S.C. § 1117(a).

During the eight-day trial, defendants did not seriously deny infringing the Fishman trademark and falsely advertising the guitars as containing Fishman pickups; much of the extensive testimony and argument focused on whether the defendants' violations were willful. The evidence showed that the guitars in question had been manufactured for HSN in China by Force Limited ("Force"), which had previously made Esteban guitars for HSN using pickups supplied by a company named Belcat.

Then, in 2006, Force substituted another Belcat pickup that Belcat told Force was a Fishman or "Fishman-type" pickup; Force then advised HSN that the guitars contained Fishman pickups and so identified the pickups in the specifications; HSN passed on the information to Paul. Whether or not Fishman made the new Belcat pickup or supplied technology for it,[1] defendants now

---

[1]Fishman, it appears, both competed with and sold to Belcat, and some of Belcat's sales to a Japanese manufacturer married Fishman pickups and Belcat preamps. Fishman also has an agreement

-4-

concede that the HSN advertising and sales in question used the Fishman trademark without authorization.

At the close of trial, the jury found trademark infringement and false advertising in violation of the Lanham Act; but the jury also found that neither violation was "willful." In a post-trial decision, <u>Fishman Transducers, Inc.</u> v. <u>Paul</u>, No. 07-10071, 2011 WL 1157529 (D. Mass. Mar. 29, 2011), the judge agreed that willfulness had not been shown, adding that the jury's finding would bind him anyway. Because the violations were not willful, and separately because of conventional equitable balancing, he chose not to order disgorgement of profits. <u>Id.</u>

Fishman has now appealed. The applicable standard of review varies with the issue and whether the claim was properly preserved. Fishman's appeal is directed primarily to its claims under the Lanham Act. Section 1125 of the Act creates federal causes of action both for misuse of a trademark and false advertising that misrepresents the source of goods; section 1117 permits trebling of a damage award, a recovery of defendant's profits, and an award of attorney's fees in "exceptional" cases. 15 U.S.C. §§ 1117(a), 1125(a).[2]

---

with Belcat allowing it to manufacture pickups with Fishman-patented technology, but Belcat is precluded from advertising them as Fishman products.

[2]The structure of the Lanham Act's remedial provisions is confusing, Mark A. Thurmon, <u>Confusion Codified: Why Trademark Remedies Make No Sense</u>, 17 J. Intell. Prop. L. 245 (2010), but in

Fishman's first claim is that the district court mishandled the central issue of willfulness, both in its instructions and in responding to two jury questions. Interestingly, the term "willful" appears in section 1117 only in relation to two provisions not of immediate importance here--one relating to dilution claims (section 1125©) and another with counterfeit marks (section 1116(d)), 15 U.S.C. § 1117(a), (c)(2)-- and similarly in section 1125 only in relation to dilution of a famous mark and domain name registration, 15 U.S.C. § 1125(c)(5)(B), (d)(2)(D)(ii).

Rather, the governing language provides:

> The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.

15 U.S.C. § 1117(a).

---

addition to sections 1125(a) and 1117--themselves no models of clarity or consistent interpretation--a number of other provisions deal with specialized violations (e.g., counterfeiting marks), other remedies (such as injunctions and destruction) and special situations (e.g., liability of printers and publishers).

Nevertheless, in Lanham Act cases, courts (including this one) have used willfulness as a gloss or screen in deciding what remedies to provide for ordinary infringement. While damages in trademark or false advertising cases can be awarded without any special showing of scienter or equitable factors, e.g., Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813, 819-20 (7th Cir. 1999), our cases usually require willfulness (one primary exception involving direct competition is discussed below) to allow either (1) more than single damages or (2) a recovery of the defendant's profits.[3]

Because the district court excluded testimony on damages, Fishman's remaining hope was to recover the defendant's profits, but this required a showing of willfulness. The jury found that trademark infringement and false advertisement occurred but that the violations were not willful. The judge treated the finding as binding, adding that his own view was the same and that no other equitable ground for awarding profits to Fishman had been established.

On this appeal, Fishman argues that the jury's finding that the violations had not been willful was impaired both by errors in the court's instructions to the jury and by inaccurate

---

[3]E.g., Visible Sys. Corp. v. Unisys Corp., 551 F.3d 65, 81 (1st Cir. 2008); Tamko Roofing Prods., Inc. v. Ideal Roofing Co., Ltd., 282 F.3d 23, 36 & n. 11 (1st Cir. 2002); Aktiebolaget Electrolux v. Armatron Int'l, Inc., 999 F.2d 1, 5 (1st Cir. 1993); see also La Quinta Corp. v. Heartland Props. LLC, 603 F.3d 327, 345 (6th Cir. 2010); J. Thomas McCarthy, 5 McCarthy on Trademarks and Unfair Competition § 30.62 (4th ed. 2012).

answers that the court gave to questions the jury asked during deliberations. We address these claims on the merits--several have ongoing importance for future trademark cases--but conclude finally that such errors as occurred did not affect the outcome.

In federal civil litigation willfulness requires a conscious awareness of wrongdoing by the defendant or at least conduct deemed "objectively reckless" measured against standards of reasonable behavior.[4] The criminal standard is slightly more demanding because it requires a subjective indifference to risk for recklessness--sometimes called willful blindness--as the minimum condition for a willfulness finding. See United States v. Griffin, 524 F.3d 71, 80 (1st Cir. 2008).

The district judge in this case instructed the jury that:

> In order to consider whether it's willful, consider whether the defendants knew or should have known about the mark and that it belonged to the plaintiff; second, that the defendants knew or should have known that their own conduct was infringing the plaintiff's mark; and third, and importantly, the defendants intentionally sold products in connection with the infringing mark with the knowledge that it infringed. An act that is done willfully is done voluntarily and intentionally as opposed to by mistake or accident.

---

[4]Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 57-58 (2007); Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc., 620 F.3d 1305, 1319 (Fed. Cir. 2010); accord In re Seagate Tech., LLC, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (willful patent infringement), cert. denied, 552 U.S. 1230 (2008); In re Barboza, 545 F.3d 702, 707-08 (9th Cir. 2008) (willful copyright infringement); Zazú Designs v. L'Oréal, S.A., 979 F.2d 499, 507 (7th Cir. 1992) (willful trademark infringement).

(Emphasis added.)

Fishman is right that the underscored language fails to make clear that objective recklessness is also a basis for finding willfulness in the civil context. Whether Fishman adequately preserved the claim of error in its colloquy with the judge is doubtful, Scarfo v. Cabletron Sys., Inc., 54 F.3d 931, 946 (1st Cir. 1995) (requiring that an instructional error and the proposed correction be adequately identified); but, if preserved (which we need not decide), there is no doubt that the underlined portion set the bar too high and might have confused the jury.[5]

The district judge also instructed the jury that the plaintiff bore the burden of proving willfulness by clear and convincing evidence. Fishman did preserve this objection and argued that the appropriate burden is preponderance of the evidence. The district judge denied the request relying on Tamko Roofing, where this circuit noted in passing that the jury in the district court found willfulness by clear and convincing evidence, 282 F.3d at 29; but the burden of proof was not a disputed issue and our decision in Tamko Roofing did not adopt any standard.

---

[5]Fishman's counsel pointed to a failure to mention recklessness; the district judge replied that he had "said 'known or should have known'"--which sets the standard too low--and Fishman's counsel then gave a response that failed to point out that on this reading the jury was being given two inconsistent standards, one too high and one too low--neither being correct.

The ordinary rule in civil cases is proof by a preponderance of the evidence, Herman & MacLean v. Huddleston, 459 U.S. 375, 387 (1983), and the text of section 1117 does not prescribe a different burden of proof. Fraud, a cousin to willfulness, has an historical association with the clear and convincing standard but the modern tendency in the Supreme Court is to reserve the clear and convincing burden, unless dictated by statute, for matters with constitutional implications like civil commitment.[6]

This was the view taken in Herman & MacLean, holding that the preponderance standard should govern the main anti-fraud provision of the Securities Exchange Act. 459 U.S. at 382, 390. The Court also noted that in prior cases, it had found the preponderance standard applicable for "imposition of even severe civil sanctions." Id. at 389; see also Grogan v. Garner, 498 U.S. 279, 291 (1991) (Bankruptcy Code fraud provision); Ramsey v. United Mine Workers of Am., 401 U.S. 302, 311 (1971)(antitrust treble damages). The one recent decision looking the other way, Microsoft Corp. v. i4i Ltd. Partnership, 131 S. Ct. 2238 (2011), rested primarily on statutory interpretation. Id. at 2249-50, 2252.

---

[6]E.g., Broun et al., 2 McCormick on Evidence § 340 at 488-89 (6th ed. 2006); Sand et al., 4 Modern Federal Jury Instructions: Civil, Instruction 73-3 (2012). Compare Addington v. Texas, 441 U.S. 418, 433 (1979) (establishing clear and convincing evidence burden of proof for civil commitment).

Authority in other circuits is divided on whether in Lanham Act cases to equate fraud or willfulness with a heightened standard of proof,[7] but the modern guidance of <u>Herman & MacLean</u> and <u>Grogan</u> supports the ordinary preponderance standard where, as here, the statutory language does not call for more. The omission of the term willful in the relevant portion of section 1117 contrasts with its explicit use elsewhere in section 1117. So, as a matter of first impression in this circuit, we think preponderance the proper standard.

Finally, Fishman claims that the district judge erred in responding to two questions from the jury during its deliberations relating to willfulness. One question in substance was "whether a failure to act can constitute willfulness"; to this the judge gave the jury the reporter's transcript of the oral instruction on willfulness (which contained a confusing mis-transcription to which neither side objected after review). <u>Fishman Transducers</u> v. <u>Paul</u>, 2011 WL 1157529 at *1 n.1 (D. Mass. March 29, 2011). Fishman did preserve a claim that the answer to the question should merely have been "yes," but the judge could regard this as an oversimplified answer and properly refuse to give it.

---

[7]<u>Compare</u> <u>Versa Prods. Co.</u> v. <u>Bifold Co. (Mfg.)</u>, 50 F.3d 189, 207-08 (3d Cir.) (applying a heightened burden of proof to the intent to confuse or deceive in trade dress infringement cases), <u>cert. denied</u>, 516 U.S. 808 (1995), <u>with</u> <u>Harrods Ltd.</u> v. <u>Sixty Internet Domain Names</u>, 302 F.3d 214, 226-27 (4th Cir. 2002) (applying a preponderance of the evidence standard to the bad faith requirement in the Lanham Act's cyberpiracy provision).

The second jury question was, "Is HSN responsible for their own published document on the worldwide web when they are aware of its incorrect information?". In response, the judge sought to explain that HSN was "responsible" for the content of its own website but, at least as to willfulness, not for something HSN did not control. This was reasonable enough given evidence that Fishman concedes that HSN sent warning letters to third party sites later selling the Esteban guitars with the erroneous claims to Fishman products.

Although the jury instructions were (understandably) mistaken on burden of proof and potentially confusing on recklessness, neither was harmful to Fishman because the evidence was insufficient to justify a finding of willfulness even under the correct preponderance standard and a perfect understanding of willfulness. Under the standard governing review of jury verdicts, we conclude that no reasonable jury could have found a willful violation in this case.

Force, the maker of the guitar, orally represented to HSN that it included a "Fishman-type" pickup and in a product specification sheet noted that the guitars had a Fishman pickup. HSN relayed this information to Paul before he went on-air. Nothing indicates that defendants were any more than negligent in passing on that representation. In particular, no evidence indicated that the defendants had knowledge of the infringement or

were reckless in failing to learn of it.  When told of the error HSN promptly stopped claiming that its pickups were Fishman products.

Paul did say on the air that he had personally selected Fishman's products for the guitars, which he admitted at trial was not true; and he praised the Fishman pickups in terms exceeding anything represented by Force Limited--for example, that the pickups in the guitars were "top of the line."  But none of these statements remotely suggests that Paul knew--or was reckless in not so suspecting--that HSN was mistaken or that Force was lying when they said that the pickups in "his" guitars were Fishman pickups.

This brings us to damages and Fishman's other main basis for appeal.  Single damages can be awarded without a finding of willfulness.  But damages awards turn out to be comparatively rare in trademark cases primarily, it appears, because of the difficulty of proving them. Michael J. Freno, Trademark Valuation: Preserving Brand Equity, 97 Trademark Rep. 1055, 1062-63 (2007).  Various damage theories are available, but proving causation and amount are very difficult unless the two products directly compete (an issue to which we return), and most cases that go beyond injunctive relief involve an attempt to recoup the infringer's profits.  Id. at 1070.

The problem--of which this case is a good illustration-- is not theory but proof.  The most straightforward theory of

damages would be that the infringement had diverted specific sales away from Fishman.  See Aktiebolaget Electrolux v. Armatron Int'l, Inc., 999 F.2d 1, 6 (1st Cir. 1993) (denying damages absent lost sales).  But Fishman does not sell guitars to consumers; rather, it supplies its pickups to other guitar makers who in turn compete with Esteban, or directly to consumers through retail channels, who buy them to be installed in their own guitars.

Accordingly, on this theory, Fishman had to show--to take the most obvious possibility--that the wrongful use of the Fishman name during part of 2006 to describe pickups on the Esteban guitars diverted sales from outlets--often big box stores--who purchased competing guitars from guitar makers whom Fishman supplied; that this sales diversion in turn reduced new orders to such competing guitar makers; and that those manufacturers reduced their orders of Fishman pickups for some period, largely after the defendants' infringement ceased.

The district judge rejected the testimony of Fishman's expert, Thomas Britven, finding that Britven furnished neither a figure or range for damages suffered by Fishman nor supplied the jury with data from which it could make an intelligent estimate of Fishman's damages, if any, caused by the infringement.  Fishman's founder, Larry Fishman, also testified but the judge excluded him from testifying about the cause of the damages.  Fishman says that these exclusionary rulings were error.

-14-

Although some evidentiary rulings involve issues of fact or law, this one was a classic judgment call reviewed for abuse of discretion.  Lynch v. Boston, 180 F.3d 1, 16 (1st Cir. 1999).  The question is whether the information tendered by the expert and by Larry Fishman would help the jury to determine a fact in issue, Fed. R. Evid. 702; see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).  These witnesses' proffered testimony together was the only substantial damage evidence offered; even taken together, we agree that this evidence would not allow a reasonable jury to assess damages.

Britven sought to testify (supplying the relevant figures) that Esteban sold lots of guitars in 2006 and that (by contrast to 2006) Fishman's low-end pickup sales both dipped and missed Fishman projections for 2007.  Larry Fishman sought to opine that Esteban guitar packages did decrease Fishman pickup sales.  But Fishman's brief fails to explain how the jury was to make even a crude estimate of diverted sales from the information sought to be supplied.

Fishman's brief does offer generalities--that experts are not always required for damages, that precision may itself be misleading, and so on--but it does not offer a response to the judge's concern that the jury was essentially being left adrift.  Damage experts customarily provide the jury some means, even if the premises and line of extrapolation are open to debate, to make a

reasonable estimate.  That task, quite difficult where the products are not substitutes, was not done in this instance.

The essence of Britven's support for actual damages is that while Fishman projected its revenues from sales to manufacturers to increase from 2006 to 2007, those revenues instead decreased by nearly $750,000, felling short of projections by nearly $1.5 million.  But by limiting annual sales data to the period from 2005 through 2007, Britven does not address the possibility that Fishman's decline in sales was merely an ordinary year-to-year fluctuation.

Britven also reports, based on discussions with Fishman's management, that several of Fishman's customers reduced orders in 2007 after having trouble selling guitars with Fishman pickups through retail channels, but neither Britven nor Larry Fishman provided any information regarding the reasons that Fishman's customers suffered declining retail sales, or why it should be supposed that Esteban's infringement had anything to do with this decline.

Nor does Britven's report provide any basis for the jury to attribute all, or any particular amount of the decline in revenue or the shortfall from projections, to infringement or false advertising by Esteban.  Further, Britven's report contains no information about Fishman's profit margins or any financial information other than revenues that a jury could use to estimate

lost <u>profits</u>, which is the ultimate measure of damages.  <u>Visible Sys. Corp.</u>, 551 F.3d at 75.

Economists do have means of moving from data indicating correlation to a fair inference of causation.  In this case, such means may have included direct testimony from customers, market research surveys of guitar purchasers as to their reasons for purchases, or sales data for Fishman's competitors that might show that Fishman's sales decline was unique or unusual rather than part of broader industry wide conditions.[8]  These are often difficult, time-consuming and expensive efforts; but without them, Britven's report was merely a basis for jury speculation and his testimony was properly excluded.

The expert added to his report specific figures to show <u>Esteban</u>'s revenues but they were mainly relevant to the disgorgement of profits theory, and surely not all attributable to the trademark violation.  And, while the expert report also includes million dollar estimates for a campaign of "corrective advertising" allegedly planned by Fishman, proposed expenditures by the plaintiff that are likely to boost sales are not self-verifying damages from infringement.

---

[8]According to Britven, American sales of acoustic/electric guitars--which are acoustic guitars equipped with a pickup amplification system--declined from 242,000 in 2006 to 208,000-213,000 in 2007, a decline of 12-14 percent.  By comparison, Fishman's sales to guitar manufacturers declined from $7,398,789 in 2006 to $6,652,658 in 2007, a decline of just 10 percent.

Fishman's president himself was allowed to testify as to some specific information--e.g., identified reductions in orders by specific Fishman guitar maker customers--but neither he nor any other witness offered evidence that Esteban's infringements had caused the customers to reduce their orders. In the absence of organized economic evidence that allowed the jury to estimate damages, this information would not have been sufficient for an award of damages.

Fishman next argues that an alternative ground for awarding damages based on defendant's profits was wrongly rejected by the district judge when he ruled that Fishman pickups and Esteban guitars were not in "direct competition." Under this direct competition theory, the plaintiff and defendant products may be such complete substitutes that a sale by the infringer under the infringed party's mark is almost automatically a lost sale by the plaintiff, so the issue of causation almost vanishes from the case.

And, if the two companies are in the same line of business, defendant's profits may be presumptively similar to what plaintiff would have earned on the sale. Congress has further provided that where profits are the measure of recovery, the plaintiff need only prove the defendant's sales and the defendant must prove costs and other deductions. 15 U.S.C. § 1117(a); Tamko Roofing, 282 F.3d at 37. So, if direct competition had been

-18-

established, the evidence tendered of Esteban's revenues might have been sufficient.

The case law amply supports this approach where there is direct competition, <u>Aktiebolaget Electrolux</u>, 999 F.2d at 5 ("[A] plaintiff seeking an accounting of defendant's profits must show that the products directly compete, such that defendant's profits would have gone to plaintiff if there was no violation . . . ."), but not otherwise. <u>Valmor Prods. Co.</u> v. <u>Standard Prods. Corp.</u>, 464 F.2d 200, 204 (1st Cir. 1972) ("Since Standard's products do not, concededly, compete with Valmor's, Standard can hardly be thought, in the absence of fraud or palming off, to be a trustee for profits which but for the infringement would have been Valmor's . . . .").

But a showing of direct competition requires a substantial degree of equivalence and substitutability,[9] and a pickup is not a substitute for a guitar but merely a potential ingredient, and is even less of a substitute for a package that included additional materials. <u>See</u> <u>Quabaug Rubber Co.</u> v. <u>Fabiano Shoe Co.</u>, 567 F.2d 154, 162 (1st Cir. 1977). So while HSN's violations <u>could</u> damage Fishman sales, no plausible one-to-one

---

[9]<u>E.g.</u>, <u>Bos. Duck Tours, LP</u> v. <u>Super Duck Tours, LLC</u>, 531 F.3d 1, 26 (1st Cir. 2008); <u>Members First Fed. Credit Union</u> v. <u>Members 1st Fed. Credit Union</u>, 54 F. Supp. 2d 393, 402 n. 15 (M.D.Pa. 1999). The phrase has a similar meaning outside of the trademark context, <u>see, e.g.</u>, <u>Aegerter</u> v. <u>City of Delafield</u>, 174 F.3d 886, 891 (7th Cir. 1999)(telecommunications); <u>United States</u> v. <u>Gillette Co.</u>, 828 F. Supp. 78, 83 (D.D.C. 1993) (Clayton Act).

equivalent exists here as the number of sales diverted or the profits transferred.

What remains are two distinct claims which the district court declined to entertain. The first was for trademark counterfeiting under section 1114 of the Lanham Act. The district court rejected any attempt to pursue this theory because it was not pled in the complaint which, for federal claims, relied only specifically upon trademark infringement and unfair competition under section 1125(a). Whether or not the facts in the complaint might have supported a trademark counterfeiting claim does not matter so late in the process (on the eve of trial, over four years after the initial filing of the complaint).

Sections 1114 and 1125 are distinct claims and support different remedies. Compare 4 McCarthy on Trademarks & Unfair Competition § 25:10 with Res. Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc., 926 F.2d 134, 139 (2d Cir. 1991). Fishman could not wait until discovery was over and then announce without amendment of the complaint that it wanted to assert a new federal cause of action.

The second excluded claim, under Massachusetts' unfair competition statute, was rejected by the district court because it requires that the wrongful actions and transactions "occurred primarily and substantially within the commonwealth [of Massachusetts]." Mass. Gen. Laws Ann. ch. 93A, § 11 (2011).

-20-

Fishman concedes that the HSN advertising was not particularly targeted to Massachusetts customers and that no more than a "small portion" of HSN's guitar sales occurred within Massachusetts.

Instead Fishman argues that section 11's "primarily and substantially" test--most recently framed by Massachusetts' highest court as a "center of gravity" test, <u>Kuwaiti Danish Computer Co.</u> v. <u>Digital Equip. Co.</u>, 781 N.E.2d 787, 799 (Mass. 2003)--is nonetheless satisfied because Fishman is a Massachusetts-based corporation so all of the harm occurred there. That a Massachusetts company was arguably deprived of sales may be relevant, <u>In re Pharm. Indus. Average Wholesale Price Litig.</u>, 582 F.3d 156, 194 (1st Cir. 2009), but here the direct impact of the deception--to the extent it occurred--was on customers all over the country, few of whom were in Massachusetts.

Where wrongdoing is not focused on Massachusetts but has relevant and substantial impact across the country, the "primarily" requirement of section 11 cannot be satisfied. "<u>Kuwaiti Danish</u> did not retreat from the proposition that, if the significant contacts of the competing jurisdictions are approximately in the balance, the conduct in question cannot be said to have occurred primarily and substantially in Massachusetts." <u>Uncle Henry's Inc.</u> v. <u>Plaut Consulting Co., Inc.</u>, 399 F.3d 33, 45 (1st Cir. 2005).

<u>Affirmed.</u>